# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re:<br><br>BESTWALL LLC,[1]<br><br>        Debtor. | Chapter 11<br><br>Case No. 17-31795 (LTB) |
| BESTWALL LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>        Defendants. | Adv. Pro. No. 17-3105 (LTB) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS
TO THE DEBTOR'S MOTION FOR AN ORDER (I) PRELIMINARILY ENJOINING
CERTAIN ACTIONS AGAINST NON-DEBTORS, OR (II) IN THE ALTERNATIVE,
DECLARING THAT THE AUTOMATIC STAY APPLIES TO SUCH ACTIONS AND
(III) GRANTING A TEMPORARY RESTRAINING ORDER PENDING A
<u>FULL HEARING ON THE MOTION</u>**

---

[1] The last four digits of the Debtor's taxpayer identification number are 5815. The Debtor's address is 100 Peachtree Street, N.W., Atlanta, GA 30303.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

SUMMARY OF ARGUMENT .................................................................. 3

STATEMENT OF FACTS ....................................................................... 6

    I.    ASBESTOS DISEASE IS UNIQUE IN THAT OFTEN INJURY
        MANIFESTS MANY YEARS AFTER EXPOSURE........................................ 6

    II.   THE GEORGIA-PACIFIC ASBESTOS LIABILITIES AT ISSUE IN
        THIS CASE CONCERN THE PRODUCTS AND CONDUCT OF "OLD
        GP"................................................................................ 8

    III.  THE DEBTOR'S CORPORATE HISTORY WAS DESIGNED TO
        MANIPULATE BANKRUPTCY LAW. ................................................ 8

    IV.  THE DEBTOR HAS LIMITED BUSINESS OPERATIONS........................... 11

ARGUMENT ................................................................................ 15

    I.    THE DEBTOR CANNOT DEMONSTRATE A LIKELIHOOD OF
        SUCCESS ON THE MERITS BECAUSE NEW GP IS DIRECTLY
        LIABLE FOR GEORGIA-PACIFIC ASBESTOS LIABILITIES AND
        ITS ATTEMPTS TO ARGUE OTHERWISE IGNORE
        CONSTITUTIONAL PROTECTIONS. .............................................. 15

        A.   The Debtor Cannot Satisfy the Standard for Issuance of a
           Preliminary Injunction to Protect Old GP or New GP Because this
           Court Must Reject, as Violative of the Supremacy Clause and the
           Due Process Clause, any Attempt to use State Law to Undermine
           Section 524(g) of the Bankruptcy Code.................................. 15

           1.   The Supremacy Clause Establishes Section 524(g)'s
               Hegemony Over the Allocation of an Asbestos Debtor's
               Assets and the Due Process Rights of Its Creditors; State
               Law Cannot Frustrate this Core Principle................................ 16

           2.   Section 524(g) Provides for the Delicate Balancing of the
               Interests of the Reorganizing Company with Asbestos
               Claimants, and the Use of Texas State Law to Upset This
               Balance is Prohibited by the Supremacy Clause........................ 19

               a.   The Legislative History of the Texas Divisive
                   Merger Statute Reflects that it was Not Designed to
                   Address the Due Process Rights of Future
                   Claimants Nor Provide a Steady, Ongoing Stream
                   of Revenue for Their Benefit .......................................... 22

b.  The Legislative History of Section 524(g) of the
Bankruptcy Code Reflects that it Provides
Extraordinary Relief and Resulted from the Careful
Balancing of Interests in the Unique Context of an
Asbestos Bankruptcy Case .............................................. 23

3.  Georgia-Pacific's Use of the Texas Divisive Merger Statute
to Alter the Assets Available for Asbestos Claimants'
Liabilities Conflicts with the Purposes of the Bankruptcy
Code and is Preempted by Section 524(g). ............................... 29

a.  The Texas Divisive Merger Statute as Applied is
Preempted by Section 524(g) Under the Doctrine of
Conflict Preemption .......................................................... 31

b.  The Texas Divisive Merger Statute as Applied is
Preempted by Section 524(g) Under the Doctrine of
Field Preemption ............................................................... 33

B.  The Debtor Cannot Demonstrate a Likelihood of Success on the
Merits Because Neither Section 524(g) Nor Section 362(a) Provide
Authority to Enjoin Old GP's and  New GP's Direct, Non-
Derivative Liability. ................................................................. 35

1.  Relief Under Section 105 Must be Tied to Another
Statutory Section of the Bankruptcy Code. .................................. 35

2.  Section 524(g) Provides for Non-Debtor Relief for Certain
Limited Categories of Non-Debtors Whose Liability is
Derivative of the Debtor's Liability. ........................................... 37

a.  Old GP Is Not Eligible For Relief Under Section
524(g) Because it has Direct Liability for the
Georgia-Pacific Asbestos Liabilities ................................ 40

b.  New GP Is Not Eligible For Relief Under Section
524(g) Because it has Direct Liability for the
Georgia-Pacific Asbestos Liabilities ................................ 40

3.  Section 362 Does Not Provide a Basis For the Entry of a
Non-Debtor Injunction Under These Facts Where the
Parties Have Deliberately Constructed Their Relationship
in an Effort to Confer Jurisdiction in This Court Which
Would Otherwise Not Exist and the Debtor Has Nothing to
Reorganize. ............................................................................ 42

a.  The Court Does Not Have Jurisdiction Over the
Claims Against Old GP and New GP Sought to be
Stayed ............................................................................... 42

b.  The Debtor Has Nothing to Reorganize ........................... 43

C.    The Risk to the Debtor if an Injunction is Not Entered, If Any, is Minimal and Does Not Outweigh the Harm Suffered by Individuals with Asbestos Personal Injury Claims. ................................. 44

D.    The Equities and Public Interest Weigh in Favor of Denying the Motion. ................................................................................................. 45

II.    ISSUANCE OF A PRELIMINARY INJUNCTION OR EXTENSION OF THE AUTOMATIC STAY TO OLD GP OR NEW GP WOULD BE INEQUITABLE. ............................................................................................. 46

CONCLUSION.................................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................26, 27

*Bessette v. Avco Fin. Servs., Inc.*,
230 F.3d 439 (1st Cir. 2000)..............................................................36

*In re Brier Creek Corporate Center Associates Ltd.*,
486 B.R. 681 (4th Cir. 2013)..............................................................43

*Carolin Corp. v. Miller*,
886 F.2d 693 (4th Cir. 1989)..............................................................46

*In re Coleman*,
426 F.3d 719 (4th Cir. 2005).............................................................35

*In re Combustion Engin'g, Inc.*,
391 F.3d 190 (3d Cir. 2005)......................................................... *passim*

*In re Congoleum Corp.*,
No. 03-51524, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) ..............................23, 24, 25

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000)...............................................................36

*Curtis v. Loether*,
415 U.S. 189 (1974).......................................................................18

*Dairy Queen, Inc. v. Wood*,
369 U.S. 469 (1962).......................................................................18

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990)....................................................................20, 21

*In re Euell*,
271 B.R. 388 (Bankr. D. Colo. 2002) ....................................................37

*Farina v. Nokia Inc.*,
625 F.3d 97 (3d Cir. 2010)................................................................29

*In re FCX, Inc.*,
853 F.2d 1149 (4th Cir. 1988) ............................................................21

*In re Fed.-Mogul Global Inc.*,
   684 F.3d 355 (3d Cir. 2012)..................................................................21, 24, 34

*Florida Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963)..........................................................................................20

*In re G-I Holdings, Inc.*,
   327 B.R. 730 (Bankr. D.N.J. 2005) ................................................................37

*In re Garlock Sealing Technologies, LLC*,
   504 B.R. 71 (Bankr. W.D.N.C. 2014).............................................................11

*Georgine v. Amchem Products, Inc.*,
   83 F.3d 610 (3d Cir. 1996).................................................................................6

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) (Marshall, C.J.)...............................................19

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
   471 U.S. 707 (1985)..............................................................................19, 21, 33

*Hines v. Davidowitz*,
   312 U.S. 52 (1941)............................................................................................20

*Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*,
   124 F.3d 487 (3d Cir. 1997)............................................................................29

*Integrated Telecom Express, Inc.*,
   384 F.3d 108 (3d Cir. 2004)............................................................................46

*Kestell v. Kestell*,
   99 F.3d 146 (4th Cir. 1996) ......................................................................36, 37

*Marrama v. Citizens Bank of Mass.*,
   549 U.S. 365 (2007)..........................................................................................46

*In re Morrell*,
   394 B.R. 405 (Bankr. W.Va. 2008) ................................................................21

*MSR Exploration, Ltd. v. Meridian Oil*,
   74 F.3d 910 (9th Cir. 1996) ..................................................................33, 34, 35

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)..........................................................................................17

*Official Committee of Equity Security Holders v. Mabey*,
   832 F.2d 299 (4th Cir. 1987) ..........................................................................36

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)........................................................................26, 27

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979).................................................................................43

*Pastor-Camarena v. Smith*,
    977 F. Supp. 1415 (W.D. Wash. 1997)....................................................38

*Perez v. Campbell*,
    402 U.S. 637 (1971)................................................................21, 22, 30, 31

*In re Premier Automotive Serv., Inc.*,
    492 F.3d 274 (4th Cir. 2007) ..................................................................46

*In re Quigley Co., Inc.*,
    676 F.3d 45 (2d Cir. 2012).................................................................40, 42

*Real Truth About Obama, Inc. v. FEC*,
    575 F.3d 342 (4th Cir. 2009) .............................................................15, 19

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)................................................................................21

*In re Saxby's Coffee Worldwide, LLC*,
    436 B.R. 331 (Bankr. E.D. Pa. 2010) ......................................................36

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999)....................................................................46

*In re Tate*,
    253 B.R. 653 (Bankr. W.D. N.C. 2000)....................................................37

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) .............................................25, 29, 31, 32

*United States v. Carolina Parachute Corp.*,
    907 F.2d 1469 (4th Cir. 1990) ................................................................36

*United States v. Lamp*,
    606 F. Supp. 193 (W.D. Tex. 1985).....................................................37, 38

*United States v. Onslow Cnty. Bd. of Educ.*,
    728 F.2d 628 (4th Cir. 1984) ............................................................20, 22, 29

*United States v. Ron Pair Enterprises, Inc.*,
    489 U.S. 235 (1989)...........................................................................37, 38

*In re Universal Money Order Co.,*
    470 F. Supp. 869 (S.D.N.Y. 1977) ...................................................21

*Williford v. Armstrong World Industries,*
    715 F.2d 124 (4th Cir. 1983) ......................................................44

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................15

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ...............................................................20

**Statutes**

U.S. CONST. art. I, § 8. ...............................................................16

U.S. CONST. art. VI, cl. 2 ....................................................4, 16, 19

U.S. CONST. amends. V ...............................................................4

U.S. CONST. amend. XIV, § 1 ....................................................4, 17

11 U.S.C. § 105(a) .....................................................................35

11 U.S.C. § 362..................................................................*passim*

11 U.S.C. § 524(e) ....................................................................16

11 U.S.C. § 524(g) .............................................................*passim*

28 U.S.C. § 157(b)(5) .................................................................18

Tex. Bus. Orgs. Code Ann. § 1.002 ...................................................22

**Other Authorities**

140 Cong. Rec. 28,358 (1994) ........................................................24

140 Cong. Rec. 8021 (1994) .......................................................24, 25

140 Cong. Rec. S4523 (1994) .........................................................34

H.R. Rep. No. 103-835 (1994).........................................................24

House Bus. & Com. Committee, Bill Analysis, Tex. H.B. 472, 71st Leg. (1989) ...........22, 23

2 *Collier on Bankruptcy,* ¶ 105.01[1] (Richard Levin & Henry J. Sommer eds.,
    16th ed.) ...........................................................................36

Ronald Barliant, *et al.*, *From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies*, 12 AM. BANKR. INST. L. REV., 441 (2004) ....................... 40

Lawrence Fitzpatrick, *The Center for Claims Resolution*, 53 LAW & CONTEMP. PROBS. 14 (1990) ................................................................................................ 26

Curtis W. Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L. J. 109 (1989) .......................................................................... 22, 23

Francis E. McGovern, *Asbestos Legislation II: Section 524(g) without Bankruptcy*, 31 PEPP. L. REV. 233 (2003) ............................................................. 40

The Official Committee of Asbestos Claimants (the "Committee"), by and through its undersigned counsel, submits the following objection (the "Objection") to Plaintiff Bestwall LLC's (the "Debtor") *Motion for an Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) in the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (III) Granting a Temporary Restraining Order Pending a Full Hearing on the Motion* [Adv. Docket No. 2] (the "Motion").  In support of its Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

This bankruptcy case is the culmination of Georgia-Pacific's[2] carefully orchestrated scheme to discharge its direct, non-derivative asbestos-related liabilities at a substantial and unwarranted discount notwithstanding its represented ability to fully pay all of those liabilities both presently and in the future.

Through a corporate reorganization, ostensibly permitted by Texas state law, Old GP placed the vast majority of its asbestos liabilities in the Debtor, and the vast majority of its assets in New GP.  Both the Debtor and New GP now claim that New GP has no direct liability to its asbestos victims but is entitled to the Bankruptcy Court's protection in the form of the injunction sought here (and the permanent injunction to be sought as part of a plan).

Georgia-Pacific's success here poses an existential threat to section 524(g) of the Bankruptcy Code, which provides a unique and exclusive remedy for the difficult and otherwise

---

[2]  "Old GP" refers to Georgia-Pacific LLC, as it existed before a certain July 31, 2017 corporate restructuring described below and is the same terminology used by the Debtor in this case.  "New GP" is the term used by the Debtor in this case to describe the entity which was Old GP absent those limited assets and the sizable asbestos liabilities "assigned" to the Debtor following the corporate restructuring completed in July 2017. "Georgia-Pacific" or "GP" refers to Old GP, New GP, and the Debtor together.

seemingly unsolvable issues raised by asbestos liability.  For decades, section 524(g) has provided a path for the continued, profitable operation of companies that have liability for exposing individuals to asbestos and asbestos-containing products and whose ability to continue operations is threatened by that liability.  Section 524(g) simultaneously provides a remedy for the harm to these asbestos victims, including those who are unaware of either the existence or scope of their injuries.  The creation of a company-funded trust and the appointment of a legal representative to protect the rights of those whose injuries have not yet manifested are just two of section 524(g)'s innovative provisions that balance a company's continued financial health with the rights of asbestos victims to fair compensation for their deadly and disabling injuries.

Georgia-Pacific's scheme threatens this comprehensive statutory set of protections by providing a blueprint for asbestos defendants whose financial viability is not threatened by their asbestos liabilities to nevertheless place their liabilities in bankruptcy, keep their assets safely out of reach, starve the fund available to compensate victims, and abrogate the rights of current and future claimants.  This untenable result contravenes section 524(g)'s purposes, contradicts the Supremacy Clause of the Constitution, and violates the Due Process rights of creditor asbestos victims.  This Court should reject this abuse of the Chapter 11 bankruptcy process and rule that the extraordinary and exclusive relief available under section 524(g) cannot be subverted by a transparent manipulation of corporate form.  To the extent Texas law permits this, it frustrates the intent of section 524(g) of the Bankruptcy Code and, as applied here, is preempted by the Supremacy Clause of the United States Constitution.

## <u>SUMMARY OF ARGUMENT</u>

This Objection raises two issues of first impression[3] involving the critical Constitutional

principles of federal preemption and due process:

(1)     whether section 524(g) preempts Georgia-Pacific's attempt to use the

Texas Business Organizations Code to cabin Old GP's asbestos liabilities in the Debtor

and shield New GP from those liabilities; and

(2)     whether section 524(g) limits the situations in which a channeling

injunction may enjoin actions against third parties to those where a third party has

derivative liability for the claims against the debtor.

As to the first issue, in July 2017, through an unprecedented use of the Texas divisive

merger provisions, Old GP moved virtually all its assets and operations to New GP while

consigning virtually the full magnitude of its asbestos liability to the Debtor.  The Debtor relies

on this corporate sleight-of-hand to contend that New GP is magically absolved of liability for

Old GP's asbestos liabilities (the "<u>Georgia-Pacific Asbestos Liabilities</u>").[4]  Moreover, the Debtor

seeks to extend the third-party relief and protections, otherwise only available under section

524(g) of the Bankruptcy Code, to New GP, on the basis that New GP has 'potential' liability for

the Georgia-Pacific Asbestos Liabilities 'derivative' of the Debtor's.  The Texas Divisive Merger

Provisions cannot permit an entity to create two successors – only one of which remains

responsible for its asbestos liability – and provide the now-free of liability entity with the same

---

[3]  Whether section 524(g) preempts state law with respect to the permanent resolution of asbestos liability for an
operating company is an issue of first impression nationally.  Whether section 524(g)(4) limits non-debtor relief to
derivative liability is an issue of first impression in this Circuit.  The Third Circuit Court of Appeals has held that
section 524(g)(4)(A)(ii) relief is limited to the four relationships described therein, each of which describes a
relationship where the non-debtor is derivatively liable for the debts of the debtor.  *See In re Combustion Engin'g,
Inc.*, 391 F.3d 190, 236 (3d Cir. 2005).

[4]  *See Declaration of Tyler L. Woolson in Support of First Day Pleadings* ("<u>Woolson Declaration</u>" or "<u>Decl.</u>")
[Docket. No. 2] at ¶ 10.

protections available under section 524(g).  The only way for New GP to obtain the protections

of section 524(g) would be for New GP to file its own bankruptcy case.

The doctrine of federal preemption requires this Court hold New GP directly liable for

the Georgia-Pacific Asbestos Liabilities as Old GP's successor.  Texas law cannot be used to

thwart the due process protections provided to present and future asbestos claimants through

section 524(g).  *See* U.S. CONST. art. VI, cl. 2 ("This Constitution, and the Laws of the United

States …. shall be the supreme Law of the Land; and the Judges in every State shall be bound

thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

The Supremacy Clause is premised on two fundamental principles of our democracy: (i) that

matters of national importance must be applied uniformly throughout the states; and (ii) that the

states are prevented from depriving citizens of their federally granted rights.  Both principles are

at stake here.

Our argument regarding the supremacy clause is simple: section 524(g) of the

Bankruptcy Code provides the exclusive and comprehensive mechanism for a company to

achieve a fair and permanent resolution of its present and future asbestos liability and continue in

business.[5]  To the extent that Texas law conflicts with the procedures and purposes of section

524(g), federal bankruptcy law prevails.[6]

As to the second issue described above, the plain language of section 524(g) does not

provide for a non-debtor to receive a channeling injunction for direct, non-derivative liability.

Neither New GP nor Old GP falls within the limited categories of third parties eligible to receive

---

[5] As discussed below, section 524(g) implicates other foundational Constitutional provisions, including the Due Process Clauses of the Fifth and Fourteenth Amendments.  See U.S. CONST. amends. V and XIV, § 1.

[6] This Court need not find that the Texas divisive merger statute is fully preempted, but only preempted as applied here in the unique context of asbestos liability.

the benefits of a section 524(g) injunction.  Therefore, section 524(g) cannot provide a basis for

providing Old GP and New GP with section 105(a) relief.  Further, without the anticipated

benefit of receiving the protection of a section 524(g) injunction, New GP has no incentive to

fund a plan of reorganization and asbestos trust, without which the Debtor cannot reorganize.  As

a result, section 362 does not provide a basis for the section 105(a) relief sought here.  The

Motion must be denied as to Old GP and New GP and the temporary injunction that has

protected those entities since commencement of this case must be lifted.

The integrity of the chapter 11 process, the jurisdiction and authority of this Bankruptcy

Court, and the fundamental principles of equity that guide this Court's decision-making are all

challenged by this case.  The Debtor did not come to this Court with a good-faith

reorganizational purpose—indeed it has not sought to reorganize anything.  Instead, the Debtor

exists as the product of a scheme to pervert the purposes of Chapter 11 and section 524(g) and

has presented a structure intentionally designed to manipulate the bankruptcy process despite Old

GP's/New GP's admitted ability to fully pay its present and future asbestos liabilities as

established in the tort system.  This case is about an attempt by Old GP, now New GP, to obtain

a section 524(g) injunction without subjecting its assets and operations to the bankruptcy

transparency and procedure associated with the relief it seeks.  The Debtor has volunteered as

much.[7]

---

[7] "On July 31, 2017, Old GP completed an internal corporate restructuring [the divisive merger] . . . . It did so . . .to
provide additional optionality regarding potential alternatives for addressing those claims [asbestos-related claims]
in the future, including through the commencement of a chapter 11 reorganization proceeding to utilize section
524(g) of the Bankruptcy Code ***without subjecting the entire Old GP enterprise to chapter 11***." Decl. at ¶ 16
(emphasis added).

The relief the Debtor and New GP seek here should be rejected completely and swiftly. Thousands of mesothelioma victims are watching and waiting for relief; for both present and future claimants, time is short.[8]

## STATEMENT OF FACTS

I.   **ASBESTOS DISEASE IS UNIQUE IN THAT OFTEN INJURY MANIFESTS MANY YEARS AFTER EXPOSURE.**

As stated in *Georgine v. Amchem Products, Inc.* decades ago:

> This case arises against the background of an asbestos litigation crisis:
>
> [This] is a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s.  On the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related diseases, a continuing stream of claims can be expected.  The final toll of asbestos related injuries is unknown.

*Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 618-619 (3d Cir. 1996).

Asbestos exposure results in many forms of disease, including cancers of the mesothelial linings around the lungs, abdomen, heart and testes, lung, breast, bladder, larynx, colon, and stomach, lung scarring (asbestosis) and scaring of the pleura (pleural plaques or thickening), and other cancers.  All forms of asbestos cause all of these asbestos-related diseases.  Because asbestos is a carcinogen at extremely low levels and remains in the body for long periods of time, there is no known level of exposure that does not carry a risk of cancer.

The vast amount of Georgia-Pacific's asbestos liability is to those with mesothelioma, a form of cancer affecting the serosal linings around the lungs, abdomen, heart, and testes that is always fatal, usually within eighteen months to two years from diagnosis.  Those with

---

[8] Illustrative of this indisputable fact, two of the eight living asbestos claimants appointed to the Asbestos Claimants Committee, Committee Chair Cresante Perreras and Committee Member Steven Lanphear, have died since the commencement of this case.

mesothelioma waste away (a condition known as cachexia) and often patients with the most

common form of mesothelioma around the lung (mesothelioma of the pleura) literally suffocate

to death.  Mesothelioma also occurs in other parts of the body, including the abdomen

(mesothelioma of the peritoneum), heart (mesothelioma of the pericardium), and testicles

(mesothelioma of the tunica vaginalis).  A larger number of future claimants exist who will be

diagnosed in the future, but are presently unaware that they are sick.

There is no debate that Georgia-Pacific:

- manufactured, distributed and sold products that intentionally contained asbestos;

- operated numerous facilities employing large labor forces where asbestos exposures occurred, both in the manufacturing process and from in-place asbestos (i.e. thermal system insulation, asbestos insulating blankets, asbestos cement, gaskets, packing, dryer felts in paper machines, asbestos cloth, brakes (vehicle and machine), ceiling tiles, acoustical materials, clutches (vehicle and machine), asbestos tile, drywall joint compounds, plastics, and adhesives);

- exposed its own workforce, numerous invitees to Georgia-Pacific's premises, and family members of employees and invitees to asbestos from Georgia-Pacific's premises;

- made and sold products made with talc that contained asbestos; and

- exposed and continues to expose people to in-place asbestos in home, businesses, and other facilities.

The dispute in the tort system and which Bestwall would have this Court decide is

whether exposure to Old GP's products caused a particular claimants' asbestos disease.  These

are issues decided every day in the tort system.  Each claimant is entitled to his/its day in Court.

This is a foundational matter of Constitutional law.

## II. THE GEORGIA-PACIFIC ASBESTOS LIABILITIES AT ISSUE IN THIS CASE CONCERN THE PRODUCTS AND CONDUCT OF "OLD GP".

This case concerns the Georgia-Pacific Asbestos Liabilities. Old GP was a defendant in asbestos litigation since at least 1979 and spent over $2.9 billion dollars defending and resolving more than 430,000 personal injury lawsuits related to asbestos exposure.[9] To date, the Georgia-Pacific Asbestos Liabilities have largely arisen from Old GP's joint compound product, which was widely distributed for both commercial and home use. Old GP, however, made numerous other asbestos-containing products used in a variety of settings, and was a distributor and retailer of other companies' asbestos products (both industrial, skilled-trade, and consumer products). Additionally, the Georgia-Pacific Asbestos Liabilities include vast premises liability arising from Old GP's factories and mills across the country where tens of thousands of people were exposed to asbestos over many decades. Finally, Old GP used talc in a number of its products, some of which may have included asbestos and also provide a basis of liability for asbestos disease resulting from exposure to those products.

As of September 30, 2017, there were approximately 64,000 asbestos claims pending, including approximately 22,000 that were being actively litigated and approximately 13,300 claims pending on inactive dockets in various jurisdictions.

## III. THE DEBTOR'S CORPORATE HISTORY WAS DESIGNED TO MANIPULATE BANKRUPTCY LAW.[10]

Koch Industries, Inc. acquired Old GP in 2005 at a substantial discount based on its known asbestos liability. Old GP became a wholly-owned subsidiary of Georgia-Pacific Holdings LLC, a Delaware limited liability company ("GP Holdings"). On December 29, 2006,

---

[9] Decl. ¶ 25.

[10] The facts set forth herein are as set forth in publicly filed documents or from the Woolson Declaration.

Old GP converted into a Delaware corporation and a few days later converted into Georgia-Pacific LLC.

The scheme to thwart Georgia-Pacific's obligations and avoid the requirements attendant to the exclusive remedy provided by section 524(g) was long in the making, but it began to be executed on July 31, 2017, less than 100 days before this case was filed.  On that day, Old GP executed a "corporate restructuring" by moving to Texas (for less than a day) to utilize Texas's divisive merger statute.   In truth, this was purely a paper transaction – nothing physically "moved."

The Texas statute permitted Old GP to divide into two new entities - one with limited assets and one with the remaining assets of Old GP.  The limited asset entity became the Debtor, a company with no employees, holdings valued at approximately $175 million, and a contractual right to certain payments under a "Funding Agreement."[11]  On this, its first day of existence, the Debtor was also assigned liability for virtually all of Old GP's asbestos liabilities.  The same day, the Debtor "moved" to North Carolina for purposes of accessing this Court for its intended bankruptcy filing.

The second new entity, which acquired all of Old GP's other assets and liabilities, "moved" back to Delaware on the same day and resumed operations under the name "Georgia-Pacific LLC," the entity referred to in this case as New GP.  New GP also got one more thing: it was assigned an indemnification from the Debtor for the Georgia-Pacific Asbestos Liabilities. Specifically, the time line was as follows:

---

[11] *See generally Second Amended and Restated Funding Agreement* ("Funding Agreement") [Docket No. 2], Annex 2.

| 07/31/2017 at 8:00 A.M., central time, 9:00 A.M., eastern time | Georgia-Pacific LLC, a Delaware limited liability company, converted to Georgia-Pacific LLC, a Texas limited liability company (Texas filing) |
|---|---|
| 07/31/2017 at 8:00 A.M., central time, 9:00 A.M., eastern time | Georgia-Pacific LLC, a Delaware limited liability company, converted to Georgia-Pacific LLC, a Texas limited liability company (Delaware filing) |
| 07/31/2017 at 11:30 A.M., central time, 12:30 P.M., eastern time | Georgia-Pacific LLC, a Texas limited liability company, was divided into Georgia-Pacific LLC, a Texas limited liability company, and Georgia-Pacific DE LLC, a Texas limited liability company |
| 07/31/2017 at 12:30 P.M., central time, 1:30 P.M., eastern time | Georgia-Pacific DE LLC, a Texas limited liability company, converted to Georgia-Pacific LLC, a Delaware limited liability company |
| 07/31/2017 at 3:51 P.M., central time, 4:51 P.M., eastern time | Georgia-Pacific LLC, a Texas limited liability company, converted to Georgia-Pacific LLC, a North Carolina limited liability company |

Both the Debtor and New GP existed as Texas entities for less than five (5) hours.

The corporate restructuring included more transactions:

- Two more companies, GP Industrial Plasters LLC ("PlasterCo"), a North Carolina limited liability company, and Industrial Plasters Canada ULC ("PlasterCo Canada"), a Nova Scotia unlimited company, were formed to hold the plasters business;

- Old GP purchased land (but not the improvements) at a facility located in Mt. Holly, North Carolina ("Mt. Holly Land") from an indirect subsidiary of GP Holdings;

- Old GP then entered into a long-term ground lease of that land to the indirect subsidiary ("Mt. Holly Lease").  Ownership rights in the Mt. Holly Land and the rights as lessor under the Mt. Holly Lease were transferred to Bestwall.

From its inception, the Debtor's entire corporate purpose was to provide Georgia-Pacific

with a resolution of the Georgia-Pacific Asbestos Liability without Old GP or New GP being

-10-

subjected to a bankruptcy filing. *See, e.g.,* Informational Brief at 8. [12]  Because of the operation

of the automatic stay and the benefit of the temporary injunction in place to date, Georgia-

Pacific's improper scheme has already provided over nine months of relief from its asbestos

liabilities.  Today, the Debtor sits in chapter 11 protected from thousands of asbestos lawsuits by

the automatic stay.  Old GP and New GP remain shielded as well.[13]

Ninety-three (93) days before the Petition Date, the Debtor domiciled itself in North

Carolina, a jurisdiction in which Old GP previously had limited assets, where Georgia-Pacific

apparently believed this Court would provide a friendly forum.[14]  On November 2, 2017 (the

"<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code.

## IV.    THE DEBTOR HAS LIMITED BUSINESS OPERATIONS.

New GP manufactures and sells tissue, pulp, paper, packaging, and building products –

the overwhelming majority of Old GP's businesses.[15]  GP Holdings is the direct parent of the

Debtor and New GP.

---

[12] "Informational Brief" refers to the *Informational Brief of Bestwall LLC* [Docket No. 12].

[13] While claimants are denied compensation for their injuries, Old GP and New GP enjoy the cost savings associated with the stay of asbestos litigation and the corresponding defense and settlement costs.  According to the Debtor's Informational Brief, Old GP spent $200 million in the first 10 months of 2017 on defense and indemnity of asbestos liabilities.  Informational Brief at p. 5.  The Committee estimates that New GP has realized a cost savings of approximately $165 million since the Petition Date.

[14] Based on the Debtor's Informational Brief, it appears that the Debtor filed in North Carolina to seek to have this Court accept an estimation of its asbestos liability at an amount greatly reduced from what it would pay if it remains in the tort system, as the Court did in *In re Garlock Sealing Technologies, LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014). (It is important to note that notwithstanding the Court's estimation of Garlock's liability at $125,000,000, the parties thereafter reached a consensual resolution for $500,000,000.)

[15] GP's product line – now New GP's product line – includes such house-hold names as Brawny, Angel Soft, Dixie, Mardi Gras, Quilted Northern, and Stainmaster, as well as a host of building products that include DENS® wall panels, DENSDECK® roof boards, panels, lumber and plywood, and chemical products that include coatings resins, oil and gas proppants, and wood adhesives.  GP packaging products include containerboard and Kraft paper.

The Debtor is the direct parent of non-debtor PlasterCo, and PlasterCo is the direct parent

of Blue Rapids Railway Company LLC, a Kansas limited liability company ("BRRC") and

PlasterCo Canada. PlasterCo "develops, manufactures, sells and distributes gypsum plaster

products…." Decl. ¶ 16. PlasterCo "owns or leases three operating facilities," none of which are

located in North Carolina. *Id.* BRRC "operates a short line railway system associated with

PlasterCo's facility" in Kansas. *Id.* PlasterCo Canada "holds assets for the benefit of the plaster

business that are located in Canada." *Id.*

The Debtor is a non-operating entity—little more than a holding company — formed for

the sole purpose of filing this bankruptcy action in an attempt to permanently resolve the

Georgia-Pacific Asbestos Liabilities. It has no operations, income, or even employees. Rather,

it pays its expenses through $32 million in cash and the Funding Agreement with New GP. In

other words, the Debtor, while allegedly separate from New GP after the one-day "move" to

Texas, exists solely based upon the financial benevolence of New GP under the Funding

Agreement.

The Funding Agreement describes what will be funded under its terms. Included as a

"Permitted Funding Use"[16] is "the payment of any and all costs and expenses of [the Debtor]

incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in

connection therewith, including the costs of administering the Bankruptcy Case and any and all

other costs and expenses of [the Debtor] incurred in the normal course of its business …."

Funding Agreement, ¶ 1, definition of "Permitted Funding Use". It also includes "funding of

---

[16] "Permitted Funding Use" under the Funding Agreement dated as of November 1, 2017, but effective as of July 31, 2017 (as it may be amended, restated, modified or supplemented from time to time) between Georgia-Pacific LLC and the Debtor provides that "a key objective of this restructuring [the divisive merger] was to make certain that the Debtor had the same ability to fund the costs of defending and resolving present and future asbestos claims as Old GP . . . ." Decl. ¶ 16.

any amounts necessary or appropriate to satisfy … (ii) [Georgia-Pacific Asbestos Liabilities] in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization ….” *Id.* Finally, for purposes of this Objection, it also provides for “any ancillary costs and expenses of [the Debtor] associated with such [Georgia-Pacific Asbestos Liabilities] and any litigation thereof, including the costs of any appeals.” *Id*.

The Funding Agreement, however, is unsecured and is not guaranteed by Koch Industries or any other solvent affiliate.  Moreover, the Funding Agreement expressly provides for the “sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of Payor.”  Funding Agreement, ¶ 4(b)(i).

In addition to being entirely financially dependent upon New GP with respect to this bankruptcy case, the Debtor is entirely dependent upon employees of New GP to do its work – as the Debtor has no employees.  The Debtor and New GP are parties to a services agreement whereby New GP provides it “with certain centralized corporate and administrative services including legal, accounting, tax, human resources, information and technology, risk management and other support services.”  The Debtor’s subsidiary, PlasterCo and New GP are parties to a similar services agreement.

Additionally, the Debtor and New GP are parties to a secondment agreement “pursuant to which New GP assigns to the Debtor certain employees, including an in-house legal team that primarily manages the defense of asbestos-related claims.”  The Debtor and its two subsidiaries, PlasterCo and PlasterCo Canada, have entered into a cash pooling agreement that provides for a coordinated cash system among them.  While PlasterCo does generate cash, should it need

additional capital, it has entered into a revolving credit agreement with New GP which allows it to access capital.[17]

None of Old GP, New GP, or the Debtor has made any claim that Georgia-Pacific's Asbestos Liabilities threaten their financial viability or that their ability to pay all present and future asbestos liabilities was ever in question.  To the contrary, they tout their ability to pay the Georgia-Pacific Asbestos Liabilities in full.  It appears that the real purpose of the filing is to improperly seek a "bankruptcy discount."[18]  That is, this bankruptcy case appears designed to permit New GP to escape the Georgia-Pacific Asbestos Liability by paying a substantially discounted sum while protecting New GP and its assets from claims it would otherwise face in the tort system,[19] and to achieve all of this while never entering into bankruptcy itself.

---

[17] There is a significant question whether Bestwall itself can itself qualify for a section 524(g) injunction as any chapter 11 plan it could seek to confirm would almost certainly be a liquidating plan.

[18] The delay associated with a bankruptcy case alone places Georgia-Pacific in an advantageous negotiating position because it hurts only the claimants.  One need not look any further than the Informational Brief to see that the Debtor is using this proceeding to threaten the claimants.  The Debtor spends over seven pages discussing its position that claimants engaged in fraud in connection with settlements reached in the tort system.  *See* Informational Brief at pp. 26-34.  Georgia-Pacific is hoping that the threat of years of delay in compensation, threats of litigation against the claimants and the plaintiffs' law firms, the potential of an estimated liability based on a theory divorced from the tort system, and the potential that New GP will not have the financial wherewithal to pay the liability when the time comes will cause the plaintiffs accept a settlement that is much less than Georgia-Pacific would have paid if it remained in the tort system.

[19] Indeed, if New GP does not like the estimate, under the Funding Agreement, it can transfer assets equal to the difference between the estimate and its estimate and get a second bite at a liability estimate in connection with fraudulent conveyance litigation.

-14-

## ARGUMENT

I.    **THE DEBTOR CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE NEW GP IS DIRECTLY LIABLE FOR GEORGIA-PACIFIC ASBESTOS LIABILITIES AND ITS ATTEMPTS TO ARGUE OTHERWISE IGNORE CONSTITUTIONAL PROTECTIONS.**

A.    **The Debtor Cannot Satisfy the Standard for Issuance of a Preliminary Injunction to Protect Old GP or New GP Because this Court Must Reject, as Violative of the Supremacy Clause and the Due Process Clause, any Attempt to use State Law to Undermine Section 524(g) of the Bankruptcy Code.**

"A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendent lite* of the type available after the trial…. Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by 'a clear showing' that, among other things, it is likely to succeed on the merits at trial." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345-346 (4th Cir. 2009) (internal citations omitted), *cert. granted, judgment vacated*, 559 U.S. 1089 (2010), *and adhered to in relevant part* 607 F.3d 355 (4th Cir. 2010).

In order to obtain a preliminary injunction, the Debtor must establish "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama*, 575 F.3d at 346. Each of the four standards must be established. *Real Truth About Obama*, 575 F.3d at 346.

Here, the Debtor is not able to satisfy any one of the four requirements for entry of an injunction in favor of Old GP or New GP and its Motion must be denied.

### 1.  The Supremacy Clause Establishes Section 524(g)'s Hegemony Over the Allocation of an Asbestos Debtor's Assets and the Due Process Rights of Its Creditors; State Law Cannot Frustrate this Core Principle.

Art.VI, clause 2, also known as "the Supremacy Clause," provides:

> This Constitution and the Laws of the United States …. shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

The Supremacy Clause requires that matters of national importance are applied uniformly throughout the states and that the states are prevented from depriving citizens of federally granted rights.

Article I, Section 8, of the Constitution authorizes Congress to enact "uniform Laws on the subject of Bankruptcies." *Id*. at art. I, § 8.  Under this grant of authority, Congress enacted the "Bankruptcy Code" in 1978.  The Bankruptcy Code, codified as Title 11 of the United States Code, is the uniform federal law that governs all bankruptcy cases.  Section 524(e) of the Bankruptcy Code, with two narrow exceptions, provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).  Section 524(g) provides one of the two exceptions to section 524(e).[20]

Due Process protections for debtors and creditors are encompassed in the Bankruptcy Code.  The due process protections found in the Fifth and Fourteenth Amendments to the Constitution provide that no person may be deprived of life, liberty, or property without due process of law.  The Fifth Amendment applies to attempted deprivations by the federal

---

[20]  The other exception, not relevant here, concerns community claims in a consumer bankruptcy case.

government.  The Fourteenth Amendment goes further and ensures that no *state* can deprive a

person of the rights granted by the federal government through its statutes, common law or, most

singularly, the Constitution.  *See* U.S. CONST. amend. XIV, § 1 ("All persons born or naturalized

in the United States, and subject to the jurisdiction thereof, are citizens of the United States and

of the State wherein they reside.  No State shall make or enforce any law which shall abridge the

privileges or immunities of citizens of the United States; nor shall any State deprive any person

of life, liberty, or property, without due process of law; nor deny to any person within its

jurisdiction the equal protection of the laws.").

    The Due Process mandate assures that all levels of government must operate within the

law and provide fair procedures.  *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S.

306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding

which is to be accorded finality is notice reasonably calculated, under all the circumstances, to

apprise interested parties of the pendency of the action and afford them an opportunity to present

their objections.").

    Georgia-Pacific's one-day "move" to Texas to facilitate its attempt to use the Texas

divisive merger act provides a perfect example of how the Supremacy Clause and the Due

Process Clause work together to safeguard fundamental rights which otherwise could be

trampled by misuse of a state law.  In this case, the rights that are at stake are the rights of

asbestos claimants throughout the United States, including those whose injuries have not yet

manifested, to have their claims fairly adjudicated and compensated, whether in the tort system

or, pursuant to the specific, tailored provisions for doing so provided by the Bankruptcy Code.

Section 524(g) of the Bankruptcy Code includes express due process protections for both debtors

facing massive liabilities and present and future victims facing years of a progressive, fatal disease.

In addition, even in bankruptcy, creditor asbestos victims have a right to a trial by jury of their claims against the debtor. *See Curtis v. Loether*, 415 U.S. 189, 195-96 (1974); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962). The importance of an injured parties' right to his or her day in court is recognized and affirmed by the Judicial Code that governs the jurisdiction of bankruptcy courts and provides, in pertinent part, that the district court "*shall* order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." 28 U.SC. § 157(b)(5) (emphasis added). This Constitutional right to a trial to seek redress for an injury or wrongful death may be modified or limited in only a very few circumstances. Sections 362 and 524(g) can delay that right, although even where an asbestos trust is created, claimants ultimately have the right to access the tort system. While the Bankruptcy Code automatically provides a debtor some relief to restructure and propose a plan to compensate its creditors, any modification of the right to immediate access to the courts necessarily must be carefully guarded when addressing claims against non-debtors.

The supremacy of section 524(g) of the Bankruptcy Code over state law and the important procedural protections it provides to debtors and creditors alike cannot be undermined by resort to a state corporate law that was never intended to create an escape hatch for tortfeasors. Vital constitutional principles are implicated by the relief sought by the Debtor in its Motion to protect Old GP and New GP.

In direct contradiction of the Supremacy Clause, the Debtor seeks to manipulate state law to avoid the unambiguous mandates and limitations of a federal statute specifically drafted to address the concerns of both asbestos debtors and claimants. *See* 11 U.S.C. § 524. Because section 524 preempts state law on this issue, the Debtor cannot "make a clear showing that it will likely succeed on the merits at trial." *Real Truth About Obama*, 575 F.3d at 346 (citing *Winter*, 555 U.S. at 20, 22-24.

A company can discharge its asbestos liabilities only one way: through an injunction entered under section 524(g). Movants have used Texas state law to create entities solely for the purpose of recharacterizing direct claims as indirect. As Congress intended to provide a comprehensive and exclusive remedy for the participants in this specific area of asbestos bankruptcy, state law cannot be used to avoid the plain meaning of section 524(g) and this recharacterization of the claims cannot be accepted by this Court. The Supremacy Clause dictates this result.

**2. Section 524(g) Provides for the Delicate Balancing of the Interests of the Reorganizing Company with Asbestos Claimants, and the Use of Texas State Law to Upset This Balance is Prohibited by the Supremacy Clause.**

Unquestionably, Congress has the power to preempt state law. *See* U.S. CONST., art. VI, cl. 2; *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13 (1985) ("It is a familiar and well-established principle that the Supremacy Clause, U.S. CONST., art. VI, cl. 2, invalidates state laws that "'interfere with, or are contrary to,' federal law."); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210-11 (1824) (Marshall, C.J.) ("The nullity of any act, inconsistent with the constitution, is produced by the declaration, that the Constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the State Legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged State powers, interfere with, or are contrary to the

laws of Congress, made in pursuance of the constitution, or some treaty made under the authority

of the United States."); *United States v. Onslow Cnty. Bd. of Educ.*, 728 F.2d 628, 635 (4th Cir.

1984) ("It has long been recognized that state enactments which 'interfere with, or are contrary

to the laws of congress, made in pursuance of the constitution' must yield to federal

preemption.") (citation omitted).

    In determining whether federal law has preempted state law, the Supreme Court has

directed that courts be guided by two "cornerstones:" (1) "the purpose of Congress is the

ultimate touchstone in every pre-emption case[,]" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)

(citations omitted),[21] and (2) "[i]n all pre-emption cases, and particularly in those in which

Congress has legislated ... in a field which the States have traditionally occupied, ... we start with

the assumption that the historic police powers of the States were not to be superseded by the

Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotes

omitted).  Preemption typically falls into three categories:

- **Conflict preemption:**  "[S]tate law is pre-empted to the extent that it actually conflicts with federal law," *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), such as when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

- **Field preemption:**  Preemption may be found where "[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . . [o]r the Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be

---

[21] "Pre-emption fundamentally is a question of congressional intent." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).

assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947) (citations omitted).[22]

- **Express preemption:** "Under the Supremacy Clause, [and] acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms." *Hillsborough Cnty.,* 471 U.S. at 713.

These three categories "should not be taken to mean that they are rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption." *English v. Gen. Elec. Co.,* 496 U.S. 72, 79 n.5 (1990). This is not to suggest that the Texas statute is preempted entirely by the federal Bankruptcy Code. However, under these circumstances, where the Texas Divisive Merger Statute is used to create corporate forms which conflict with the procedures, protections, and intent of the Bankruptcy Code it must be deemed preempted under conflict and/or field preemption.[23] *Perez v. Campbell*, 402 U.S. 637, 644 (1971); *see also In re Morrell,* 394 B.R. 405, 418 (Bankr. W.Va. 2008) (West Virginia's "bankruptcy only" exemption law did not frustrate the intent of the federal bankruptcy code and therefore was not preempted under the Supremacy Clause of the United States Constitution.); *accord In re Universal Money Order Co.,* 470 F. Supp. 869, 873 (S.D.N.Y. 1977) ("It is well settled that where a state statute conflicts with a mandate of the Bankruptcy Act, it is invalid under the Supremacy Clause of the Constitution.").

---

[22] The federal laws governing nuclear safety provide an example of field preemption. The Supreme Court has concluded that "the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." *English*, 496 U.S. at 82 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983)).

[23] Express preemption is not present here. While courts have explicitly preempted state law in enacting certain sections of the Bankruptcy Code, including sections 541 and 1123, *see e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 219 n.27 (3d Cir. 2004) ("Section 541 effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assigns its interest in bankruptcy."); *In re FCX, Inc.*, 853 F.2d 1149, 1154 (4th Cir. 1988) ("[Section] 1123(a) . . . read[s]: 'Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . ,' By its plain language then, § 1123(a)(5)(D) overrides nonbankruptcy law restrictions on the distribution of collateral to satisfy a claim secured by the same."); *In re Fed.-Mogul Global, Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) (noting § 1123(a) is an instance where Congress used "explicit language" to demonstrate its intent "to displace state nonbankruptcy law.") (citations omitted)), no such corresponding language appears in section 524(g).

In the seminal bankruptcy case, *Perez v. Campbell*, 402 U.S. 637, 641-642, 656 (1971), the Supreme Court invalidated a state statute that withheld driving privileges from debtors who failed to satisfy motor-vehicle-related tort judgments against them, even if the judgments were discharged under bankruptcy law.  The Court stated, "… the determination of whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict."  *Perez*, 402 U.S. at 644; *accord Onslow Cnty. Bd. of Educ.*, 728 F.2d at 635.  *Perez* concluded that whether or not the legislature intended to conflict with a federal statute was irrelevant because "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause."  *Perez*, 402 U.S. at 652.  We now undertake the two-pronged analysis of the Texas statute and the Bankruptcy Code required by *Perez*.

> ### a.    *The Legislative History of the Texas Divisive Merger Statute Reflects that it was Not Designed to Address the Due Process Rights of Future Claimants Nor Provide a Steady, Ongoing Stream of Revenue for Their Benefit.*

The Texas Divisive Merger Statute permits a "divisive merger," which is defined as "the division of a domestic entity into two or more new domestic entities or other organizations or into a surviving domestic entity and one or more new domestic or foreign entities or non-code organizations[.]"  Tex. Bus. Orgs. Code Ann. § 1.002(55)(A) (defining "merger" to include a divisive merger).  The concept of a divisive merger has existed in Texas state law since the Texas Legislature enacted certain amendments to the Texas Business Corporation Act (the "TCBA") in 1989.  *See* Curtis W. Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L. J. 109, 115-16 (1989); *see also* House Bus. & Com. Committee, Bill Analysis, p. 1-2, Tex. H.B. 472, 71st Leg. (1989) (noting Article 1.02 of the Texas Business

Corporation Act was amended in 1989 to include concept of divisive merger) (attached hereto as Exhibit "<u>A</u>").

The 1989 TBCA amendments represented "continuing efforts to provide Texas with modern and flexible corporation laws . . . ."  House Bus. & Com. Committee, Bill Analysis, p. 1, Tex. H.B. 472, 71st Leg. (1989).  The legislative history for the 1989 amendments to Article 5.01 of the TCBA, in addition to noting that the divisive merger provision was "unprecedented," described the statute as streamlining the division process by allowing "a single transaction as part of a statutory merger without the use of conveyancing documents."  *Id*. at p. 23.

The purpose of the "divisive merger" provision was nothing more than an attempt to modernize and simplify certain corporate transactions; there was no intent to affect substantive or procedural federal rights or remedies.  Curtis W. Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109, 115-16 (1989) ("The primary purpose for the TBCA's new provisions . . . is to allow Texas corporations greater flexibility in structuring and effecting acquisition, restructuring, and merger transactions").

Georgia-Pacific's attempt to use the Texas statute to cabin its asbestos liabilities appears to be the first time any entity has attempted to use the statute in this context.  Therefore, this Court does not have to find that the statute as a whole is preempted—only that the use of the statute to avoid asbestos liability is impermissible because it abrogates the intent of Congress in enacting section 524(g).

> ### b.    *The Legislative History of Section 524(g) of the Bankruptcy Code Reflects that it Provides Extraordinary Relief and Resulted from the Careful Balancing of Interests in the Unique Context of an Asbestos Bankruptcy Case.*

"Section 524(g) was added to the Code as part of the Bankruptcy Reform Act of 1994 to help companies deal with the 'flood of asbestos lawsuits' they were facing."  *In re Congoleum*

*Corp.*, No. 03-51524, 2008 WL 4186899, at *5 (Bankr. D.N.J. Sept. 2, 2008) (citing HR Rep.

No. 103–834 (1994); 140 Cong. Rec. H10765 (daily ed. Oct. 4, 1994)); *see also In re Fed.-*

*Mogul Global Inc.*, 684 F.3d 355, 378 (3d Cir. 2012) ("Congress created 524(g) as the best

course to harmonize the interests of asbestos claimants and reorganized debtors alike.") (citing to

H.R. Rep. No. 103-835, at 46-48 (1994)).  As noted, the addition of section 524(g) would "help

asbestos victims receive ***maximum value***," 140 Cong. Rec. 28,358 (1994) (statement of Sen.

Heflin) (emphasis added), while ensuring a reorganized debtor's "continued profitability,

converting it into the 'goose that lays the golden egg by remaining a viable operation and

maximizing the trust's assets to pay claims.'"  *Fed.-Mogul*, 684 F.3d at 378 (citing 140 Cong.

Rec. 8021 (1994) (statement of Sen. Brown)).

Section 524(g) was modeled on the injunction/trust mechanism pioneered in the *Johns–*

*Manville* bankruptcy case.  H.R. Rep. No. 103-835, at 404 (1994).  It created an affirmative

obligation on a debtor to place "its assets or income" into the trust to enable the trust "to pay

claims and demands."  11 U.S.C. § 524(g)(2)(B)(i)(IV).

The trust mechanism furthered "the fundamental rationale of chapter 11, that a

reorganized debtor emerges from bankruptcy free and clear other than the liability set by the

plan."  140 Cong. Rec. 8021 (1994); *see also* H.R. Rep. No. 103-835, at 40 (noting that

uncertainties surrounding asbestos-related bankruptcies had "undermined the 'fresh start'

objectives of bankruptcy").  Congress intended that a debtor, in exchange for a release from all

future asbestos liability, would transfer that corporation's assets into a trust in order to provide

"equitable compensation of present and future claimants."  *Fed.-Mogul*, 684 F.3d at 378-79.

The legislative history of section 524(g) shows that the section served several purposes,

including allowing for the reorganization of the debtor facing asbestos liability and maximizing

payments to asbestos claimants.  *See* 140 Cong. Rec. 8021 (1994) ("This amendment is a good public policy in that it not only serves the interest of reorganization of the debtor but in that it ***maximizes amounts existing and future asbestos claimants can recover***.") (statement of Sen. Brown) (emphasis added); *id.* ("[T]his legislation provides companies who are seeking to fairly address the burden of thousands of current asbestos injury claims and unknown future claims, ***and who are willing to submit to the jurisdiction of the U.S. Bankruptcy Courts*** …a method to pay their current asbestos claims and provide for equitable treatment of future asbestos claims.") (statement of Sen. Graham) (emphasis added).  As further observed by Senator Heflin:

> For companies forced to file bankruptcy any plan of reorganization must contain a mechanism to address equitably the debtor's liability to all creditors, including mass tort claims – both those whose injuries are manifest and those who, although already exposed, will not manifest any injury until sometime in the future.  Without that mechanism, ***liquidation may be inevitable and little or nothing would be left to compensate future claimants***.

*Id*. (statement of Sen. Heflin) (emphasis added).

Courts interpreting section 524(g) have found that it was "the expressed intent of Congress to create a trust that will not only relieve debtors from a flood of asbestos liability, but also provide a reliable source of payment for present and future asbestos claimants."  *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *5 (Bankr. D.N.J. Sept. 2, 2008); *see also In re Thorpe Insulation Co.*, 677 F.3d 869, 891 (9th Cir. 2012) ("Section 524(g) was specifically designed to allow companies with large asbestos-related liabilities to use Chapter 11 to transfer those liabilities, along with substantial assets, to a trust responsible for paying future asbestos claims.") (*citing* H.R. Rep. No. 103–835, at 46–47 (1994), 1994 U.S.C.C.A.N. 3340, 3354–3356).

Other efforts to address the resolution of future asbestos claims have been unsuccessful. For example, in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), asbestos products manufacturers who were members of the Center for Claims Resolution ("CCR"),[24] and who had entered into a stipulated global settlement of future asbestos claims through a class action process, moved to enjoin actions by claimants-objectors who failed to timely opt out of the class. While the district court granted the injunction, on appeal to the Third Circuit Court of Appeals, the injunction was vacated and the case was remanded with instructions to decertify the class. The Supreme Court agreed, finding that the requirements for class certification had not been met. *Id.* at 628 (rejecting class certification because too many potential plaintiffs "may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out.").

After *Amchem,* many members of the CCR, as well as many members of its predecessor, the Asbestos Claims Facility, ultimately filed for chapter 11 protection to take advantage of section 524(g) of the Bankruptcy Code, including The Celotex Corporation, Owens-Corning Fibreglas, Dana Corporation, Pittsburgh-Corning Corp., AC&S, Inc., Federal-Mogul Corp., GAF Corporation (G-I Holdings), A.P. Green Industries, Inc., Armstrong World Industries, Inc., C.E. Thurston & Sons, Quigley Co., Shook & Fletcher Insulation Co., and United States Gypsum Company. The use of section 524(g) as a remedy that equitably serves both tortfeasor and victim has been widely acknowledged and accepted.

Similarly, in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), certification of a settlement class action was sought under a limited fund rationale after a global settlement of claims against a single asbestos manufacturer was reached among certain plaintiffs, insurers, and the company.

---

[24] The CCR was formed in 1988. Lawrence Fitzpatrick, *The Center for Claims Resolution*, 53 LAW & CONTEMP. PROBS. 14, 14 (1990) ("The Center for Claims Resolution, Inc. … was formed on Oct. 6, 1988 to handle asbestos-related personal injury claims filed against its members.").

The Supreme Court held, among other things, that certification was impermissible due to an

insufficient showing of a limited fund and equitable treatment of all class members.  *Ortiz v.*

*Fibreboard Corp.*, 527 U.S. 815, 864-65 (1999).

Importantly, in each of these cases the courts were particularly concerned with the due

process rights and treatment of future claimants.  The Supreme Court in *Amchem* observed:

> Impediments to the provision of adequate notice, the Third Circuit
> emphasized, rendered highly problematic any endeavor to tie to a
> settlement class persons with no perceptible asbestos related
> disease at the time of the settlement.

*Amchem Prods.*, 521 U.S. at 628 (c*iting Georgine v. Amchem Prod.*, Inc., 83 F.3d 610, 633 (3d

Cir. 1996); *cf. Flanagan v. Ahearn (In re Asbestos Litig.)*, 90 F.3d 963, 999-1000 (Smith, J.,

dissenting)).  The court continued:

> Many persons in the exposure only category, the Court of Appeals
> stressed, may not even know of their exposure, or realize the extent
> of the harm they may incur.  Even if they fully appreciate the
> significance of class notice, those without current afflictions may
> not have the information or foresight needed to decide,
> intelligently, whether to stay in or opt out.

*Id.*

Section 524(g) is specifically designed to address the due process rights of both present

and future claimants with specific procedural and substantive requirements.  As set forth in

C*ombustion Engineering*:

- a court must find that the debtor has been named in an action for damages
  allegedly caused by asbestos, that the debtor is likely to be subject to substantial
  demands for payment in the future arising out of the same or similar conduct,
  that the amounts and timing of such future claims are uncertain, and that
  permitting the pursuit of such claims outside the trust mechanism would
  threaten the plan's attempts to deal equitably with current and future demands
  [*citing to* 11 U.S.C. § 524(g)(2)(B)(i)(I), (ii)(I-III)];

- the trust itself must also satisfy certain standards under § 524(g) in order to
  qualify for the issuance of a channeling injunction directing all future claims to

the trust;

- the trust must assume the liabilities of the debtor for current and future claims and must be funded at least in part by the securities of the debtor;

- the trust must either own, or be entitled to own, the majority of the voting shares of the debtor, its parent, or its subsidiary;

- the trust must use its assets to pay future claims and demands; and the trust must provide for mechanisms ensuring its ability to value and pay present and future claimants in substantially the same manner [*citing to* 11 U.S.C. § 524(g)(2)(B)(i)(I)-(IV), (ii)(V)];

- a court granting a § 524(g) channeling injunction must determine that the injunction is "fair and equitable" to future claimants [*citing to* 11 U.S.C. § 524(g)(4)(B)(ii)];

- the court must appoint a futures representative to represent their interests [*citing to* 11 U.S.C. § 524(g)(4)(B)(I)];

- the court must also determine that the plan treats "present claims and future demands that involve similar claims in substantially the same manner[]" [*citing to* 11 U.S.C. § 524(g)(2)(B)(ii)(V)]; and

- a 75% super-majority of claimants whose claims are to be addressed by the trust vote in favor of the plan [*citing to* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb)].

*In re Combustion Engin'g, Inc.*, 391 F.3d 190, 234 n.45 (3d Cir. 2005) (listing the requirements of section 524(g) designed to protect the due process rights all asbestos claimants) (bullets added).

Section 524(g) is the only law that provides for a comprehensive and fair resolution of a company's asbestos liability, and carefully balances the interests of the entity seeking to reorganize with those of the present and future asbestos claimants.[25]

---

[25] Fibreboard Corporation, along with its parent Owens Corning Fiberglas Corporation also eventually filed for chapter 11 to take advantage of section 524(g) of the Bankruptcy Code. In addition to Johns-Manville, over 100 other entities including mega-corporations such as Fibreboard and Owens Corning, Armstrong, Pittsburg Corning, Federal-Mogul, and W.R. Grace have sought bankruptcy protection primarily to resolve their legacy asbestos liabilities.

The use of the Texas Divisive Merger Statute to split Old GP itself into two entities,

moving its considerable asbestos exposure into the Debtor while shifting the majority of its

considerable assets to New GP, is preempted because:  (1) GP's use of the Texas Divisive

Merger Statute is contrary to the purposes, goals, and spirit of section 524(g) and therefore

conflicts with section 524(g) and (2) section 524(g) exclusively occupies the field of

administration of federal asbestos bankruptcies, including approving the reorganization of

debtors and the allocation of their assets.

In order to harmonize these statutes, the Court must find that the Georgia-Pacific

Asbestos Liabilities are direct claims against New GP, and injunctive relief for these claims is

available only to a debtor in bankruptcy.

> ### 3. *Georgia-Pacific's Use of the Texas Divisive Merger Statute to Alter the Assets Available for Asbestos Claimants' Liabilities Conflicts with the Purposes of the Bankruptcy Code and is Preempted by Section 524(g).*

After determining the respective purposes of the federal and state statutes at issue, a court

must then determine "the constitutional question [of] whether [the two statutes] are in conflict."

*Onslow Cnty.*, 728 F.2d at 635 (quoting *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*,

450 U.S. 311, 317 (1981)).  A state law is preempted when it would serve as "an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (quoting

*Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)); *see also Thorpe Insulation.,* 677 F.3d at 890

(quoting *English v. General Electric Co.*, 496 U.S. 72, 79 (1990)).

"[W]here a Congressional purpose to preempt or the existence of a conflict is clear and

manifest," *Farina v. Nokia Inc.*, 625 F.3d 97, 117 (3d Cir. 2010), *cert. denied*, 565 U.S. 928

(2011) (quoting *Fellner v. Tri–Union Seafoods, L.L.C.*, 539 F.3d 237, 249 (3d Cir. 2008)), it will

overcome the "strong presumption against inferring Congressional preemption" of state law.

*Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997).

-29-

The purpose of the Texas Divisive Merger Statute is to streamline corporate mergers and transactions; the purpose of section 524(g) is to provide companies with a methodology for staying in business while fairly compensating individuals they have harmed through asbestos exposure.  Facially there is no conflict between the statutes.  However, the conflict arises because of Georgia-Pacific's efforts to misuse the Texas Divisive Merger Statute to create the Debtor, an entity with limited assets and virtually all the legacy asbestos liabilities, while placing sizable assets out of its reach, thereby frustrating one of the primary purposes of section 524(g) – the protection of the victims of Georgia-Pacific.  *See Perez v. Campbell*, 402 U.S. 637, 652 (1971) ("[A]ny state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause.").

Neither the Debtor nor New GP can argue that the Texas Divisive Merger Statute protected Georgia-Pacific's asbestos victims.  ***None*** of the procedural protections embedded in section 524(g) are required by the Texas Divisive Merger Statute:

- there is no requirement that future claimants be represented;

- there is no disclosure, valuation, or transparency with respect to either the assets at issue or the asbestos liabilities;

- there is no requirement of notice to the claimants or approval by them;

- there is no requirement for continuing funding from the operations of the entity that generates income.

If Georgia-Pacific is permitted to use the Texas statute to divide its assets from its liabilities, and then New GP is permitted to obtain bankruptcy protection by mischaracterizing the claims against it as indirect, future claimants will be at risk of non-payment because of their inability to reach the party or parties that ultimately escaped with the assets that should have been available to those future claimants. *Id.* at 649 (when assessing the validity of a state statute in light of a federal law touching upon the same subject matter, the question is whether the statute "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).[26]

> ***a.*** ***The Texas Divisive Merger Statute as Applied is Preempted by Section 524(g) Under the Doctrine of Conflict Preemption.***

In *Thorpe Insulation*, the court found that state law anti-assignment clauses in insurance contracts were both expressly and impliedly preempted by the Bankruptcy Code. As to the implied preemption—which applies here—the court noted that the anti-assignment provisions would frustrate the objectives of asbestos related bankruptcies because they would prevent any "company with significant insurance contracts governed by California law from taking advantage of 524(g)" and interfere with the funding of the trust. *Thorpe Insulation Co.*, 677 F.3d at 890. The court concluded that "the anti-assignment provisions would subject virtually all § 524(g) reorganizations to an insurer veto." *Id.* at 891.

---

[26] New GP's absolute control over its funding obligations under the Funding Agreement permits it to pursue other means of shielding its assets from the asbestos claimants if it is not satisfied with the manner in which this case proceeds. Another corporation seeking to follow GP's path, if it is successful here, could easily construct a corporate structure that would defraud asbestos claimants outright by removing assets from their reach that by law should be available to compensate them.

*Thorpe Insulation* is on point.  The provisions of the Texas Divisive Merger Statute, as applied here, frustrate Congress' purposes under section 524(g): (1) obtaining uniformity regarding the application and effect of section 524(g); (2) ensuring that future claimants' interests are protected in any resolution of an entity's asbestos liability; and (3) obtaining fair allocation of the debtor's assets to present and future asbestos-related victims in exchange for a release of the debtor's future asbestos-related liability.  Georgia-Pacific's use of Texas state law is intended to present an "obstacle to the accomplishment and execution of the full purposes and objectives" of section 524(g) by providing Old GP with the ability to direct which entity would hold its assets and liabilities.

The Texas statute enabled Old GP to replace the assets against which the asbestos creditors had a claim with a much smaller subset of assets, assets having a value equal to ***less than one year*** of Old GP's asbestos liability.[27]  At the same time, Old GP dumped its legacy asbestos liabilities into the Debtor.  This reorganization of assets and liabilities was accomplished without any notice to the asbestos victims or protection of their interests.  Having thwarted the purposes of 524(g) and avoided the victims' substantial due process protections, New GP now seeks to invoke the protection of the Bankruptcy Code by characterizing claims against it as "indirect."

This misuse of the Texas statute and circumventing of the requirements of section 524(g) cannot be permitted.  Validating Georgia-Pacific's use of the divisive merger law to protect its assets would provide a template for future pre-bankruptcy reorganizations that would render section 524(g) a nullity.  In this context of asbestos claims, providing an entity with the right to

---

[27] According to its Informational Brief, GP spent $184 million in 2015, $174 million in 2016, and $200 million in 2018 as of the Petition Date on defense and indemnity of asbestos liabilities. Informational Brief at p. 5.  Absent the Funding Agreement, the estimated $174 million of assets held by the Debtor is facially inadequate to provide fair compensation to the present and future asbestos claimants.

alter the substantive recovery rights of claimants without protection of their interests directly

conflicts with the purpose of section 524(g) and prior case law.  For this reason, the relief sought

to benefit Old GP and New GP is preempted and should be denied.

> **b.      The Texas Divisive Merger Statute as Applied is Preempted by Section 524(g) Under the Doctrine of Field Preemption.**

The Supreme Court has consistently held that "Congress' intent to pre-empt all state law

in a particular area may be inferred where the scheme of federal regulation is sufficiently

comprehensive to make reasonable the inference that Congress 'left no room' for supplementary

state regulation." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. at 712-13 (1985)

(quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)).  "Pre-emption of a whole

field also will be inferred where the field is one in which the federal interest is so dominant that

the federal system will be assumed to preclude enforcement of state laws on the same subject."

*Id.* (internal quotations and citations omitted).

In *MSR Exploration, Ltd. v. Meridian Oil*, 74 F.3d 910 (9th Cir. 1996), the court faced

the question of "whether state malicious prosecution actions for events taking place within the

bankruptcy court proceedings are completely preempted by federal law."  *MSR Expl.*, 74 F.3d at

912.  The court held that these actions were preempted by federal law and explained that, ". . . a

mere browse through the complex, detailed, and comprehensive provisions of the lengthy

Bankruptcy Code, 11 U.S.C. 101 *et seq.*, demonstrates Congress's intent to create a whole

system under federal control which is designed to bring together and adjust all of the rights and

duties of creditors and embarrassed debtors alike."  *Id.* at 914.  The court went on to explain that,

while the Bankruptcy Code does include references to state law, "the adjustment of rights and

duties within the bankruptcy process itself is uniquely and exclusively federal.  It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process." *Id.*

As in *MSR Exploration*, the Debtor's effort to obtain a preliminary injunction in favor of Old GP and New GP based on a pre-filing use of Texas state law must be denied because Congress has preempted the field of asbestos-related corporate reorganizations.  Section 524(g) is the exclusive mechanism for providing a debtor with a release of all of its future asbestos-related liability.  *Fed.-Mogul*, 684 F.3d 355 at 378-79.  To receive the release, the debtor must transfer the corporate assets into a trust so that asbestos injury victims receive "equitable compensation" regardless of whether the individual is a present or future claimant.  *Id*.  Here, the corporate assets have been artificially limited.

In addition, section 524(g) provides specific procedural and substantive due process protections for future claimants.  *See supra* at pp. 23-29.  These protections demonstrate an important federal interest that is not included in the Texas Divisive Merger Statute.  In fact, this lack of protections for current and future asbestos victims is the impetus for the Texas reorganization.  Approving this pre-filing evasion of Georgia-Pacific's duties to asbestos victims violates due process and Congress' expressed intent in drafting and passing section 524.  140 Cong. Rec. S4523 (1994) ("[T]his legislation provides companies who are seeking to fairly address the burden of thousands of current asbestos injury claims and unknown future claims, ***and who are willing to submit to the jurisdiction of the U.S. Bankruptcy Courts,*** a method to pay their current asbestos claims and provide for equitable treatment of future asbestos claims.") (statement of Sen. Graham) (emphasis added).  By itself, the abrogation of victims' rights that would occur if the Motion was granted supports the denial of the preliminary injunction and the

lifting of the stays.  If New GP wishes to benefit from bankruptcy protection, it must file its own

petition for relief under the Bankruptcy Code.

Congress, through the incorporation of section 524(g) into the Bankruptcy Code, has

preempted the field of asbestos-related reorganizations and did not intend state corporation law

to undercut "the management of the bankruptcy process."  *MSR Exploration*, 74 F.3d at 914.

This Court should conclude that section 524(g) provides an exclusive and comprehensive remedy

for an entity to resolve its asbestos obligations if it is to continue in business without continued

liability for such obligations.  Therefore, section 524(g) preempts the avoidance of successor

liability for the asbestos obligations of New GP facially provided by the Texas statute.  A

preliminary injunction in favor of Old GP and New GP should not issue.

> **B.      The Debtor Cannot Demonstrate a Likelihood of Success on the Merits
> Because Neither Section 524(g) Nor Section 362(a) Provide Authority to
> Enjoin Old GP's and  New GP's Direct, Non-Derivative Liability.**

> ### 1.      *Relief Under Section 105 Must be Tied to Another Statutory Section of the Bankruptcy Code.*

Section 105(a) provides that the bankruptcy court "may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §

105(a).  The exercise of this general grant of equitable power, however, must be founded on

other provisions of, and exercised within the parameters of, the Bankruptcy Code itself.

*Combustion Engin'g*, 391 F.3d at 236 (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197,

206 (1988)).  Indeed, "the equitable powers that a bankruptcy court possesses 'are not a license

… to disregard the clear language and meaning of the bankruptcy statutes and rules.'"  *In re

Coleman*, 426 F.3d 719, 726 (4th Cir. 2005) (citations omitted).

Thus, "a court may invoke section 105(a) 'if the equitable remedy utilized is

demonstrably necessary to preserve a right elsewhere provided in the Code,' so long as the court

acts consistent with the Code and does not alter the Code's distribution of other substantive

rights." *Bessette v. Avco Fin. Servs., Inc.,* 230 F.3d 439, 444-45 (1st Cir. 2000) (citations

omitted); *see also In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 337 (Bankr. E.D. Pa.

2010) ("Other limits under 11 U.S.C. § 105(a) derive from the basic principle that the court must

exercise restraint before employing the potentially broad equitable power afforded under

[section] 105(a) to intervene in the legal relationships among non-debtors.").  The court's

equitable powers under section 105(a) of the Bankruptcy Code are limited in scope and do not

create substantive rights.  *In re Cont'l Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) (citing *United

States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992)); *see also* 2 *Collier on Bankruptcy,* ¶

105.01[1], at 105-06 (Richard Levin & Henry J. Sommer eds., 16th ed.) (stating that the exercise

of power under section 105 must be tied to, and not contradict, another Bankruptcy Code

section).

    "The basic purpose of section 105 is to assure the bankruptcy courts power to take

whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." *Kestell v.

Kestell*, 99 F.3d 146, 148 (4th Cir. 1996) (citing 2 L. King, *Collier on Bankruptcy* § 105.01, at

105-3 (1996)).  While the equitable powers emanating from section 105(a) are quite important in

the general bankruptcy scheme, and while such powers may encourage courts to be innovative,

and even original, these equitable powers are not a license for a court to disregard the clear

language and meaning of the bankruptcy statutes and rules.  *Official Comm. of Equity Sec.

Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987), *cert denied*, 485 U.S. 962 (1988); *United

States v. Carolina Parachute Corp.*, 907 F.2d 1469, 1475 (4th Cir. 1990) (same).  Indeed, section

105 cannot be invoked to achieve ends contrary to other specific Code provisions.  *Kestell*, 99

F.3d at 148.  "By its own terms, section 105 gives the court the additional power to 'issue *any*

order, process, or judgment necessary ... to carry out the provisions of [Title 11],' and to take any

action, even at its own initiative, 'to prevent an abuse of process.'" *Id.* (emphasis added); *see*

*also In re Tate*, 253 B.R. 653, 667 (Bankr. W.D. N.C. 2000) (section 105 encompasses any

order, whether injunctive, compensative, or punitive, as long as it is necessary to carry out

provisions of the Bankruptcy Code  and must be linked to a specific Bankruptcy Code section

and not merely to a general objective of the bankruptcy process).

Moreover, a bankruptcy court's use of section 105(a) is discretionary and must be

"carefully honed in light of the facts of the case, applicable precedent and appropriate policy."

*In re G-I Holdings, Inc.,* 327 B.R. 730, 740 (Bankr. D.N.J. 2005) (citations omitted).  "When the

Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable

relief, those standards and procedures must be observed."  *Combustion Eng'g,* 391 F.3d at 236

(citing *In re Fesco Plastics Corp.*, 996 F.2d 152, 154-55 (7th Cir. 1993)).

### 2.  *Section 524(g) Provides for Non-Debtor Relief for Certain Limited Categories of Non-Debtors Whose Liability is Derivative of the Debtor's Liability.*

Any question of statutory interpretation begins with looking at the plain language of the

statute to discover its original intent.  *In re Euell*, 271 B.R. 388, 392 (Bankr. D. Colo. 2002).  "In

order to discover legislative intent[,] the court must first look to the words of the statute itself,

giving them their usual and ordinary meaning.  *Id*. (citations omitted).  If the statute remains

unclear after looking at its language, courts will attempt to ascertain legislative intent by looking

at legislative history and other related sources.  *United States v. Lamp*, 606 F. Supp. 193, 197

(W.D. Tex. 1985), *aff'd*, 868 F.2d 1270 (5th Cir. 1989) ("[T]he legislative history of a statute is

the most fruitful source of instruction as to its proper interpretation." (citing *Graff Chevrolet Co.*

*v. Campbell*, 343 F.2d 568, 571 (5th Cir.1965))).  Courts will not adopt any interpretation that

creates an absurd result or result which the legislative body certainly did not intend.  *United*

*States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters. In such cases, the intention of the drafters, rather than the strict language, controls.") (citations omitted).

A statute must be read as a whole and given its most natural meaning. *Pastor-Camarena v. Smith*, 977 F. Supp. 1415, 1417 (W.D. Wash. 1997) ("The words used are to be given their ordinary meaning, and the language in question is to be construed in harmony with related provisions and the statute as a whole." (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and *K Mart Corp. v. Cartier Inc.*, 486 U.S. 281, 291 (1988))). Read fairly and as a whole, section 524(g) clearly describes those categories of non-debtor entities that are able to take advantage of the channeling injunction. Those non-debtor entities that have a derivative liability relationship with the debtor may obtain injunctive relief. For example, an insurer, a lender, or a purchaser who continued to operate an entity with asbestos liability, may all be subject to claims that they are liable for the debtor's liability. By its terms, section 524(g) does not apply to channel non-derivative (i.e. ***direct***) asbestos claims held against third parties. "As both the plain language of the statute and its legislative history make clear, section 524(g) provides no specific authority to extend a channeling injunction to include third-party actions against non-debtors where the liability alleged is not derivative of the debtor." *Combustion Engin'g*, 391 F.3d at 236.

Section 524(g) provides extraordinary relief unique to an asbestos bankruptcy case, but this relief is available only in strict compliance with the protections and requirements of the statute. *Id.* at 235 n.47. ("[I]n codifying the Manville 'trust/injunction mechanism' in § 524(g), Congress set forth 'explicit requirements simulating those met in the Manville case'. . . . " (citing

140 Cong. Rec. H10752, H10765 (1994))).  The purpose of section 524(g) is to provide a debtor

with the ability to equitably deal with its asbestos liability so that it may continue in business.

As discussed above, subject to certain specified rigorous conditions, section 524(g)(4)

allows the bankruptcy court to enter an injunction barring certain actions against non-debtor third

parties for liability derivative of that of the debtor.  Section 524(g)(4)(a)(ii) provides as follows:

> [A]n injunction [under 11 U.S.C § 524(g)] may bar any action
> directed against a third party who is identifiable from the terms of
> such injunction (by name or as part of an identifiable group) and is
> alleged to be directly or indirectly liable for the conduct of, claims
> against, or demands on the debtor to the extent such alleged
> liability of such third party arises by reason of —
>
> (I)    the third party's ownership of a financial interest in the
> debtor, a past or present affiliate of the debtor, or a predecessor in
> interests of the debtor;
>
> (II)    the third party's involvement in the management of the
> debtor or a predecessor in interest of the debtor, or service as an
> officer, director or employee of the debtor or a related party;
>
> (III)    the third party's provision of insurance to the debtor or a
> related party; or
>
> (IV)    the third party's involvement in a transaction changing the
> corporate structure, or in a loan or other financial transaction
> affecting the financial condition, of the debtor or a related party,
> including but not limited to—
>
> > (aa)    involvement in providing financing (debt or equity),
> > or advice to an entity involved in such a transaction; or
> >
> > (bb)    acquiring or selling a financial interest in an entity
> > as party of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii).

A third-party injunction under section 524(g)(4) is available only to the extent that a party

is alleged to be liable "for the conduct of, claims against, or demands on" the debtor and only to

the extent that such liability arises "by reason of" one of the four relationships enumerated in

subsections (I) through (IV).  That is, the third party's liability must arise as the result of the debtor's conduct or the claims asserted against it—the third party's liability must be ***derivative of the debtor's***.  *See, e.g.*, Ronald Barliant, *et al.*, *From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies*, 12 Am. Bankr. Inst. L. Rev., 441, 443-50 (2004) (describing the original purpose and policy of section 524(g)); Francis E. McGovern, *Asbestos Legislation II: Section 524(g) without Bankruptcy*, 31 Pepp. L. Rev. 233, 241-42 (2003) (same).

> ### a.    Old GP Is Not Eligible For Relief Under Section 524(g) Because it has Direct Liability for the Georgia-Pacific Asbestos Liabilities.

Old GP does not fall within any of the enumerated sections of 524(g).  The claims against Old GP do not arise "by reason of" its:  (a) ownership of the Debtor or any predecessor or affiliate of the Debtor; (b) involvement in the management of the Debtor or any predecessor; (c) provision of insurance to the Debtor; or (d) involvement in a transaction changing the corporate structure of the Debtor or a related party.  The Debtor and New GP were both created at the time of and as a result of the dissolution of Old GP.  As described above, Old GP's liability arises by reason of ***its*** distribution of asbestos-containing products and because of ***its*** manufacturing operations – not the enumerated categories of section 524(g).  Claims against Old GP are claims against Old GP and do not "arise by reason of" any of the four enumerated relationships with the Debtor.  *See In re Quigley Co., Inc.*, 676 F.3d 45, 62 (2d Cir. 2012).

> ### b.    New GP Is Not Eligible For Relief Under Section 524(g) Because it has Direct Liability for the Georgia-Pacific Asbestos Liabilities.

The Debtor undoubtedly intends to rely on section 524(g)(4)(a)(ii)(IV) to argue that claims against New GP for the Georgia-Pacific Asbestos Liabilities arise "by reason of" New GP's "involvement in a transaction changing the corporate structure" of Old GP.  However, New GP is not alleged to be directly or indirectly liable for ***the conduct of, claims against, or demands on the debtor*** as required by section 524(g)(4)(a)(ii).  The Georgia-Pacific Asbestos

Liabilities are claims against Old GP; through Old GP's dissolution, Old GP designed a structure

to cause these claims to now be asserted against the Debtor, and under the successor liability

established by the Texas Divisive Merger Statute these claims are now the Debtor's liability.

But as discussed above, New GP also has direct liability for the Georgia-Pacific Asbestos

Liabilities because:

- Old GP is the entity that manufactured and distributed the asbestos-containing product; it was the tortfeasor and its liability does not fall within any of the statutory provisions of § 524(g)(4)(A)(ii);

- New GP, formed just a year ago, did not manufacture, produce, or sell any product that contained asbestos as an intended ingredient; and

- Because the Debtor—also formed just over a year ago and likewise a successor-in-interest of Old GP—did not manufacture, produce, or sell any asbestos-containing products, New GP's liability is not, and indeed cannot be, derivative as to the Debtor. Therefore, New GP, as a successor-in-interest of Old GP, has derivative liability for Old GP's liabilities. Each of the Debtor and New GP has successor liability arising from Old GP.

Section 524(g) does not contain any exceptions for situations where a non-debtor has

direct asbestos liabilities.[28] An entity seeking protection for its direct liabilities must itself file a

petition. In doing so, the company will be protected by the automatic stay and can propose a

---

[28] The derivative nature of entitlement to 105 relief has been implicitly recognized in other asbestos chapter 11 cases. *Compare, e.g.,* [Adv. Docket No. 1] at ¶ 2 ("The Debtor has filed this adversary proceeding to enjoin any act to continue or commence against any of the Protected Parties *any action or claim asserting, on any theory* (whether direct, derivative, joint and several, successor or vicarious liability or otherwise), any Bestwall Asbestos Claims.") *with* Debtors' Complaint for Injunctive and Declaratory Relief Extending and Applying the Automatic Stay to Certain Non-Debtors, *In re Kaiser Gypsum Comp., Inc.*, Adv. Case No. 16-03313 (Bankr. W.D.N.C. 2016) [Docket No. 1] at ¶ 2 ("prevent the continuation or commencement of any action seeking to hold the Debtors' non-debtor affiliates … *derivatively liable* based on asbestos-containing products marketed, used, produced, manufactured, sold or distributed by the Debtors…" (emphasis added)) *and* Complaint of the Debtors Specialty Products Holding Corp. and Bondex International, Inc. for Injunctive and Declaratory Relief Extending and Applying the Automatic Stay to Certain Non-Debtor Affiliates, *In re Specialty Products Holding Corp. Inc.*, Adv. Case No. 10-51085 (Bankr. D. Del. 2010) [Docket No. 9], at ¶ 19 ("Accordingly, any purported liability of [non-debtor affiliates] for Debtors' Asbestos Products *would be entirely derivative* of the Debtors' purported liabilities." (emphasis added)).

plan containing a channeling injunction allowing the involuntary creditor victims to be protected

by the Bankruptcy Code and the inherent transparency of the bankruptcy process.

Similarly, the intentional structuring of the indemnification agreement as part of the

Texas divisive merger law does not alter the fact that New GP has independent, direct liability

for the Georgia-Pacific Asbestos Liabilities.  Even if New GP's liability under the

indemnification agreement could be enjoined (assuming that the Court found such relief

equitable despite the facts surrounding the divisive merger), New GP's direct liability as a

successor-in-interest to Old GP does not fall within the enumerated relationships of those non-

debtors that properly may receive the protections of a channeling injunction under section

524(g).  *Quigley*, 676 F. 3d at 57-58, 65.  New GP's only avenue to protect itself from its own

direct asbestos liabilities is to file for bankruptcy relief.

### 3.   *Section 362 Does Not Provide a Basis For the Entry of a Non-Debtor Injunction Under These Facts Where the Parties Have Deliberately Constructed Their Relationship in an Effort to Confer Jurisdiction in This Court Which Would Otherwise Not Exist and the Debtor Has Nothing to Reorganize.*

#### a.   *The Court Does Not Have Jurisdiction Over the Claims Against Old GP and New GP Sought to be Stayed.*

Section 105 cannot be utilized to extend the protections of the automatic stay under

section 362 to New GP or Old GP because this Court lacks jurisdiction over these non-debtor

claims against another non-debtor.

Ostensibly, the Debtor bases its request on the existence of the Debtor's contractual

indemnification obligation to New GP for "Bestwall" asbestos claims asserted against New GP.

This is a hollow assertion because the Funding Agreement ultimately obligates new GP to fund

the full extent of Bestwall's liability for the Georgia-Pacific Asbestos Liabilities.  The

indemnification agreement and the Funding Agreement create an entirely circular relationship.

-42-

The parties cannot confer jurisdiction in this Court through the artificial construct of the contractual indemnification provided to New GP by the Debtor.[29]

The Debtor's concern about "offensive" collateral estoppel is without merit. As discussed by the Supreme Court in the *Parkland Hoisery* case on which the Debtor relies, "a trial judge should not allow the use of offensive collateral estoppel" where "the application of offensive estoppel would be unfair." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). Here, New GP's defense would be identical to that presented by the Debtor—because the same employees are in charge of that defense regardless of the entity defending those claims.[30]

The Debtor is financially and legally neutral in connection with liability for and payment of Georgia-Pacific Asbestos Claims. The Debtor does not need the protection of freedom from asbestos litigation—New GP will defend and pay for asbestos claims. Finally, the Debtor has no role in defending New GP from its own direct asbestos liability.

This Court's jurisdiction does not extend to independent claims by asbestos claimants against New GP.

**b.      *The Debtor Has Nothing to Reorganize.***

In essence, the Debtor has nothing to reorganize. *See In re Brier Creek Corporate Center Associates Ltd.*, 486 B.R. 681, 694 (4th Cir. 2013) ("the critical, if not decisive, issue over whether injunctive relief should be granted is whether and to what extent the non-debtor

---

[29] The Committee incorporates the arguments set forth in the *Future Claimants' Representative's Objection to Debtor's Motion for an Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) in the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (III) Granting a Temporary Restraining Order Pending a Full Hearing on the Motion.*

[30] The Debtor's desire to litigate its asbestos liability in bankruptcy court rather than state court and to use New GP seconded personnel to do so does not demonstrate irreparable harm. The Debtor has significantly reduced its seconded personnel because its need for personnel is limited. And as a practical matter, Old GP took limited cases to trial, settling virtually all of the cases against it, including through the use of docket settlement agreements in place. There is likely to be little distraction in reality. Finally, New GP has the resources to hire other personnel to manage its asbestos litigation should it need to do so.

litigation interferes with the debtors' reorganization efforts." (*citing A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 996 (4th Cir. 1986))).

Further, neither the Debtor nor New GP have contended that New GP is unable to satisfy its obligations under the Funding Agreement should it not be the recipient of a section 105(a) injunction.  With no valid reason to reorganize and New GP's ability (and therefore the Debtor's ability) to fully fund any liability, dismissal of the Debtor's case—and not the extension of extraordinary injunctive relief to New GP and Old GP—is the appropriate remedy.  To do otherwise simply holds asbestos victims hostage with absolutely no resolution in sight.

In sum, the Debtor cannot demonstrate either the legal right to or the need for an injunction to aid its automatic stay under section 362.

### C.    The Risk to the Debtor if an Injunction is Not Issued, If Any, is Minimal and Does Not Outweigh the Harm Suffered by Individuals with Asbestos Personal Injury Claims.

For the reasons discussed above, the Debtor is unable to make a clear showing that it is likely to be irreparably harmed absent preliminary relief.

The only real harm the Debtor asserts is that it will be unable to accomplish the goals of its bankruptcy case.  However, the true goal of its bankruptcy case—section 524(g) relief for New GP—is beyond the jurisdiction of this Court, not available under the Bankruptcy Code, and an abuse of the bankruptcy process.  Accordingly, its inability to accomplish that goal is not a cognizable harm.

Weighed against the Debtor's harm is the harm to the victims if these actions are stayed. Asbestos victims suffer from a progressive fatal disease—as to that, there is no dispute.  A delay in their compensation is real and imminent harm.  *See, e.g., Williford v. Armstrong World Industries*, 715 F.2d 124, 127-28 (4th Cir. 1983).

**D.    The Equities and Public Interest Weigh in Favor of Denying the Motion.**

As previously discussed (and as discussed in the Objection of the Future Claimants'

Representative), GP's intentional gerrymandering of assets and manipulation of Texas state law

and the Bankruptcy elevates form over substance.  GP seeks what should be impossible for any

entity—all the benefits provided to a debtor under the Bankruptcy Code without subjecting New

GP to the actual transparency obligations and creditor protections attendant to a bankruptcy

filing.  Providing such relief to New GP would be inequitable, especially in light of the need

terminally ill individuals and their families have for seeking compensation from those entities

that directly caused their injuries.  When placed on a scale, the equities favor protecting the

individuals who are involuntary creditors of GP—the individuals that GP knowingly exposed to

harmful asbestos-containing products and premises—not the entity seeking to avoid process.

The Committee wholly agrees with the Debtor's statement that "it is in the public interest

to promote justice in the court system."  Motion, pp. 6, 24.  Our agreement with the Debtor's

position, however, ends there.  Old GP, New GP, and the Debtor are not victims here and justice

is not advanced by protecting the corporate entities over the thousands of involuntary creditors

suffering from a life threatening illness knowingly caused by GP.  Very little about the Debtor's

bankruptcy case is promoting justice in the court system.  Old GP historically paid its liabilities,

including its asbestos liabilities, in full; the Funding Agreement (and the fact that New GP has

not sought to file its own bankruptcy case) amply demonstrates that New GP believes it is able to

afford to pay all of the Georgia-Pacific Asbestos Liabilities.  Notwithstanding, allowing Old GP,

New GP, and the Debtor to escape their asbestos-related liabilities through the manipulation of

Texas state law and bankruptcy law and procedure is inequitable and inconsistent with the

exercise of justice in the court system.  While reorganization is an important matter of public

interest, it is New GP that should be seeking reorganization.  The Constitutional principles of due

process, federal supremacy and right to trial and redress overwhelming weigh in favor or the

public interest.

## II.    ISSUANCE OF A PRELIMINARY INJUNCTION OR EXTENSION OF THE AUTOMATIC STAY TO OLD GP OR NEW GP WOULD BE INEQUITABLE.

This is a court of equity and section 105 is an equitable remedy.  Old GP and New GP

have orchestrated and/or paid for the Debtor's bankruptcy for the sole purpose of gaining a

tactical advantage in settling its own direct, non-derivative asbestos liability.  More precisely,

New GP attempts to transfer its full asbestos liability to a bankruptcy mandated trust without

entering its own bankruptcy proceeding or adequately protecting its creditors.  This is the

epitome of bad faith*.  See, e.g., Integrated Telecom Express, Inc.,* 384 F.3d 108, 120 (3d Cir.

2004) (a petition filed solely to gain a tactical advantage over a litigation opponent is in bad

faith); *In re SGL Carbon Corp.*, 200 F.3d 154, 165-66 (3d Cir. 1999) (same).

While the Bankruptcy Code does not explicitly speak in terms of good faith, the right to

seek bankruptcy relief is predicated on good faith as only the "honest but unfortunate debtor" is

eligible to seek the protections afforded by the Bankruptcy Code.  *Marrama v. Citizens Bank of*

*Mass.*, 549 U.S. 365, 366 (2007) (quoting *Grogan v. Garner,* 498 U.S. 279, 287 (1991)).  The

Fourth Circuit Court of Appeals has held that there is a good faith filing requirement evident in

the Bankruptcy Code's broad policy considerations, as well in implicit in several statutory

provisions of the Bankruptcy Code.  *Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989);

*In re Premier Automotive Serv., Inc.,* 492 F.3d 274, 279 (4th Cir. 2007) (same).

This case represents an attempted misuse and abuse of Chapter 11 and section 524(g).[31] The integrity of this Court and the integrity of the Bankruptcy Code demand denial of the Motion to enjoin asbestos litigation against Old GP and New GP.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

---

[31] The Committee incorporates its *Motion of the Official Committee of Asbestos Claimants to (I) Dismiss the Debtor's Chapter 11 Case for Cause as a Bad Faith Filing Pursuant to 11 U.S.C. § 1112(B), or Alternatively, (II) Transfer Venue in the Interest of Justice and for the Convenience of the Parties Pursuant to 28 U.S.C. § 1412* and the arguments contained therein regarding the Debtor's bad faith in connection with this case.

## **CONCLUSION**

For all of the reasons discussed above, the Committee respectfully requests that the

Court: (i) deny the Debtor's Motion for a Preliminary Injunction in favor of Old GP and New

GP; and (ii) grant such other and further relief as is just and proper.


Dated:  August 15, 2018
          Charlotte, North Carolina

                            HAMILTON STEPHENS STEELE
                            + MARTIN, PLLC

                            */s/ Glenn C. Thompson*
                            Glenn C. Thompson (Bar No. 37221)
                            525 North Tryon Street, Suite 1400
                            Charlotte, North Carolina 28202
                            Telephone: (704) 344-1117
                            Facsimile: (704) 344-1483
                            gthompson@lawhssm.com

                            Judy D. Thompson
                            Linda W. Simpson
                            JD THOMPSON LAW
                            Post Office Box 33127
                            Charlotte, North Carolina 28233
                            Telephone: (828) 749-1865
                            jdt@jdthompsonlaw.com
                            LWS@JDThompsonLaw.com

                            Natalie D. Ramsey (DE Bar No. 5378)
                            Davis Lee Wright (DE Bar No. 4324)
                            Mark A. Fink (DE Bar No. 3946)
                            MONTGOMERY, McCRACKEN, WALKER &
                            RHOADS, LLP
                            1105 North Market Street, 15th Floor
                            Wilmington, DE 19801
                            Telephone: (302) 504-7800
                            Facsimile: (302) 504-7820
                            nramsey@mmwr.com
                            dwright@mmwr.com
                            mfink@mmwr.com

                            *Counsel to the Official Committee of Asbestos
                            Claimants of Bestwall LLC*

-48-